THE DOCUMENT IS FILED UNDER SEAL AND IS SUBJECT TO A
COURT ORDER REGARDING CONFIDENTIAL INFORMATION
(REDACTED VERSION)

**FILED ELECTRONICALLY**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

MAUREEN J. CAULFIELD,

                    Plaintiff,

    v.

IMAGINE ADVISORS INC.,
IMAGINE GROUP HOLDINGS, LTD.,
and individually and in their official capacities,
PER SEKSE AND ROBERT FORNESS,

                    Defendants.

No. 07-CV-1257 (DC)

**DEFENDANTS' LOCAL
RULE 56.1 STATEMENT OF
<u>UNDISPUTED FACTS</u>**

---

Defendants Imagine Advisors, Inc., Imagine Group Holdings Limited, Robert Forness and Per Sekse submit, pursuant to Local Civil Rule 56.1 of the Southern District of New York, the following statement of material facts as to which they contend there are no issues to be tried. The evidence which would be admissible that supports the material facts set forth herein is to be found in the following materials:[1]

    (a)    Plaintiff's First Amended Complaint and Demand For Jury Trial filed by Plaintiff Maureen Caulfield ("Plaintiff") in the above-captioned matter on April 13, 2007 (the "Amended Complaint");

    (b)    July 30, 2008, Deposition of Plaintiff ("Pl. Dep.");

    (c)    August 18, 2008, Deposition of Nedra Rosen ("Rosen Dep.");

    (d)    August 19, 2008, Deposition of Frank D. Tinari ("Tinari Dep.");

    (e)    August 21, 2008, Deposition of David Koegel ("Koegel Dep.");

    (f)    September 9, 2008, Deposition of Defendant, Per Sekse ("Sekse Dep.");

---

[1] Referenced testimony and documents are in a binder submitted herewith.

THE DOCUMENT IS FILED UNDER SEAL AND IS SUBJECT TO A
COURT ORDER REGARDING CONFIDENTIAL INFORMATION
(REDACTED VERSION)

(g)     September 11, 2008, Rule 30(b)(6) Deposition of Imagine Group Holdings, Ltd. by Per Sekse ("IGHL Dep.");

(h)     September 18, 2008, Deposition of Robert Forness ("Forness Dep.");

(i)     Declaration of Per Sekse, dated December 12, 2008 ("Sekse Decl.");

(j)     Declaration of Robert Forness, dated December 12, 2008 ("Forness Decl.");

(k)     Affidavit of David Koegel, dated December 12, 2008 ("Koegel Aff.").; and

(l)     Declaration of Nicole Civita, dated December 12, 2008 ("Civita Decl.").

## STATEMENT OF MATERIAL FACTS NOT IN DISPUTE

1.     Plaintiff began working for Imagine Advisors, Inc. ("IAI") on September 1, 2003; on October 2, 2006, she gave notice to IAI that she would not renew her contract when it expired on September 1, 2007.  (Def. Ex. 2; Def. Ex. 18.)

2.     At all times, Plaintiff was a "Senior Underwriter" whose "primary responsibility" was to originate business by introducing reinsurance transactions to related and non-related companies.  (Def. Ex. 2; Forness dep. at 169-70; Pl. dep. at 117; Sekse Decl. ¶ 3.)

3.     Before joining IAI, Plaintiff worked for two other reinsurance companies, Skandia America Reinsurance Corporation ("Skandia") and Swiss Re Financial Services Corporation Risk Solutions ("Swiss Re").  (Pl. dep. at 39, 52.)  Plaintiff accused both Skandia and Swiss Re of harassment and unlawful discrimination (Def. Exs. 45, 48, 49; Pl. dep. at 41, 45), ▓▓▓▓▓▓▓▓▓▓ ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ (Def. Exs. 41-42, 45, 47.)

4.     Plaintiff also accused another former employer, the Black Diamond Group, of breaching its compensation promise to her.  (Pl. dep. at 67-68.)

5.     Imagine Group Holdings Limited ("IGHL") is a Bermuda-based holding company;

THE DOCUMENT IS FILED UNDER SEAL AND IS SUBJECT TO A
COURT ORDER REGARDING CONFIDENTIAL INFORMATION
(REDACTED VERSION)

it has no employees in the United States and never did.  (Sekse Decl. ¶ 5.)

6.      IGHL had five employees during Plaintiff's last year of employment with IAI; it now has seven.  (Sekse Decl. ¶ 5.)

7.      IGHL provides specialty insurance and reinsurance products to the global insurance marketplace through licensed subsidiaries.  (*Id.* at ¶ 6.)

8.      IAI, a subsidiary of IGHL, is a reinsurance intermediary licensed in New York and Connecticut, and has always been duly licensed in the states where it did business.  (*Id.*)

9.      In the last year of Plaintiff's employment, IAI had a total of 15 employees in the United States; it now has only seven employees.  (*Id.* at ¶ 4.)

10.     IAI employs experienced reinsurance professionals, called "non-traditional underwriters," to identify and cultivate reinsurance opportunities for its Barbados-based affiliate Imagine Insurance Company Limited ("IICL"), its Ireland-based affiliate Imagine International Reinsurance Limited ("IIRL"), and for other unaffiliated companies.  (IGHL dep. at 18-19, 251-252; Sekse Decl. ¶ 6.)

11.     Neither IAI nor its employees were authorized to enter into transactions or to bind IICL, IIRL or any other entity to which they introduced business – and they never did so.  (IGHL dep. at 248; Pl. dep. at 117; Sekse Decl. ¶ 6.)

12.     Neither IAI nor IGHL was ever charged with any illegal business activity.  (Sekse Decl. ¶ 7.)

13.     Robert Forness was employed by IAI from June 2001 to December 2003, and served as the Chief Underwriting Officer of IGHL from January 2004 to June 2008.  He also served as the interim co-CEO of IGHL in 2006.  (Forness dep. at 86; Forness Decl. ¶ 1.)

14.     Forness interviewed and decided to hire Plaintiff (Pl. dep. at 107; Forness Decl. ¶ 2), and he supervised all of IAI's non-traditional underwriters, including Plaintiff (Forness Decl.

THE DOCUMENT IS FILED UNDER SEAL AND IS SUBJECT TO A
COURT ORDER REGARDING CONFIDENTIAL INFORMATION
(REDACTED VERSION)

¶1; Sekse dep. at 231) and Plaintiff's "similarly situated" co-worker David Koegel.  (Am. Compl.

¶ 135.)  After Forness relocated to Bermuda in early 2004, he continued to supervise these

employees, mainly by e-mail and telephone.  (Forness Decl. ¶ 1.)

15.     Per Sekse was employed by IAI from August 2002 through December 2003, and

again from July 2005 to September 30, 2006.  (Sekse Decl. ¶ 2.)  From October 1, 2006 through

the present, he was the Chief Investment Officer of IGHL.  (Sekse Decl. ¶ 1.)  One of Sekse's

duties during his employment by the corporate defendants was to oversee Human Resources.

(Sekse dep. at 31, 53; Sekse Decl. ¶ 2.)

16.     Sekse's contact with Plaintiff was limited to Human Resources functions (Pl. dep.

at 105); he never supervised her work. (Sekse Decl. ¶ 2.)

17.     In August 2003, Plaintiff entered into an employment agreement with IAI's

predecessor, Enterprise Advisors, that renewed automatically every year "unless written notice of

either party's intention not to extend has been given . . . not less than 180 days prior to any

extension date."  (Def. Ex. 2.)

18.     Plaintiff received a salary and was eligible for an annual cash bonus.  (*Id.*; Sekse

Decl. ¶ 8)

19.     Plaintiff was among a select group of employees who were eligible for an annual

discretionary incentive award under the Long-Term Incentive Plan ("LTIP").  LTIP awards vested

over time according to the plan's terms.  (Def. Ex. 33; Sekse Decl. ¶ 8.)

20.     Plaintiff was based in IAI's New York office with only two other employees:

Koegel and Jean-Francois Bahier, a prolific business generator whose annual production greatly

exceeded that of both Plaintiff and Koegel.  (Sekse dep. at 209-10; Koegel dep. at 84, 385-86;

Forness Decl. ¶ 5.)

21.     Plaintiff, Koegel and Bahier worked together infrequently – Bahier was seldom in

THE DOCUMENT IS FILED UNDER SEAL AND IS SUBJECT TO A
COURT ORDER REGARDING CONFIDENTIAL INFORMATION
(REDACTED VERSION)

the office, and Koegel and Plaintiff usually worked on separate projects.  (Koegel Aff. ¶ 3.)

22.     Unlike Plaintiff, Koegel is an actuary and performed actuarial duties.  (Koegel dep.
at 16-18; Koegel Aff. ¶ 2; Forness Decl. ¶ 5.)

23.     Plaintiff's primary role as a Senior Underwriter was to develop business.  (*See*, *e.g.*,
Forness Decl. ¶ 6; Def. Ex. 2, at 0357: "[Y]our primary responsibility will be to originate, analyze,
structure and execute . . . finite reinsurance and insurance transactions aimed primarily at CFO's,
CEO's, brokers and your overall contacts within the marketplace.")

24.     After successfully introducing a transaction, U.S.-based non-traditional
underwriters provide marketing and support for that transaction, which is executed by offshore
affiliates or unaffiliated entities.  (IGHL dep. at 252; Forness Decl. ¶ 6.)

25.     The productivity of IAI's non-traditional underwriters was, in recent years,
measured by the net-present value ("NPV") of the business they originated.  (Forness Decl. ¶ 7.)

26.     In 2005 and 2006, NPV targets were established for each non-traditional
underwriter.  (*Id.*)

27.     For 2006, Plaintiff set her own NPV target at $3 million to $5 million.  (Pl. dep. at
229; Def. Ex. 7, at 0730; Forness Decl. ¶7)  Koegel had the same NPV target in 2006.  (Koegel
Aff. ¶ 4.)

28.     Each non-traditional underwriter's discretionary cash bonus and discretionary LTIP
award was based largely on business origination.  (Forness Decl. ¶ 7.)

29.     Plaintiff did not successfully originate any business during her tenure and admits
that she never met her NPV target.  (Pl. dep. at 229-30; Forness Decl. ¶ 7.)

30.     At her deposition, Plaintiff was unable to identify a single piece of business that she
personally originated.  (Pl. dep. at 147-53.)

31.     Forness assigned Plaintiff to support roles in transactions originated by others as

THE DOCUMENT IS FILED UNDER SEAL AND IS SUBJECT TO A
COURT ORDER REGARDING CONFIDENTIAL INFORMATION
(REDACTED VERSION)

well as to other projects, such as monitoring a lawsuit involving a large insurance claim and

working on a new Business Quality Control project, and Plaintiff received some NPV credit for

her work.  (Forness dep. at 216-18; Forness Decl. ¶ 8; Def. Ex. 7; Pl. dep. at 151-53, 225, 227.)

32.     The IGHL Employee Handbook specifically provides management with the

authority to alter an employee's duties as company needs dictate.  Section 1.1 of the Handbook

states "the Company reserves the right to require you to assist in other departments in addition to

those duties detailed to you or in your job description."  (Def. Ex. 1 at 0384.)

33.     Plaintiff admits she produced only a little more than $1 million in total NPV from

2003 until she resigned.  (Def. Ex. 7, at 0730 ("My new/renewal business production efforts

resulted in an NPV contribution of $1.237 million to date").)

34.     Koegel also fell short of his NPV targets, but his origination exceeded that of

Plaintiff.  (Koegel dep. at 83; Pl. dep. at 232; Forness Decl. ¶ 8.)

35.     Before Plaintiff delivered her resignation notice, she received a yearly discretionary

LTIP award based on her contributions.  (Forness Decl. ¶ 9.)  Koegel also received a yearly LTIP

award based on business origination and other assigned tasks, including his role as an actuary.  (*Id.*)

36.     In early 2006, Plaintiff was assigned to help with the sale of Imagine Insurance

Aktieselskab ("IIAS"), a Danish subsidiary of IGHL.  (Forness Decl. ¶ 10.)

37.     The IIAS sale was led by Michael Daly, IGHL's London-based chief financial

officer and interim co-chief executive officer.  (*Id.*)

38.     While helping with the IIAS sale, Plaintiff speculated that Claus Johansson, an

employee of Imagine Underwriting ApS (another Danish subsidiary of IGHL) also working on the

sale, might "[i]n a worst case scenario . . . [have] some conflicts to deal with" because two bidders

for IAS had proposed a post-closing role for Johansson.  (Def. Ex. 30.)  Plaintiff communicated

her view to Forness in the last week of May (Forness dep. at 206-07; Forness Decl. ¶ 10), who

THE DOCUMENT IS FILED UNDER SEAL AND IS SUBJECT TO A
COURT ORDER REGARDING CONFIDENTIAL INFORMATION
(REDACTED VERSION)

said he would discuss the matter with Daly.  (Forness dep. at 206-07.)

39.     On June 2, without waiting for Forness to get back to her, Plaintiff confronted Johansson in an accusatory e-mail that she also sent to the team working on the IIAS sale.  (Def. Ex. 10; Forness Decl. ¶ 10.)  In this e-mail, Plaintiff demanded to know why Johansson's name appeared in a bidder's business plan and insisted that he "divulge any competing/conflicts of interest."  (Def. Ex. 10.)

40.     In contrast to Plaintiff's public accusations, Jesper Egebjerg – a colleague with whom Plaintiff shared her "conflict" concerns – wrote to Plaintiff that he did not "want to distribute" the "nightmare scenarios" they discussed because their speculation "may be unfounded."  (Sekse Decl. ¶ 25 & Ex. B.)

41.     The next morning, Daly wrote to Plaintiff and – reiterating what he had told her before – explained that the bidder's request for post-closing help from Johansson had been "clearly stated" weeks earlier in a signed term sheet, and that IGHL had even negotiated the compensation it would receive for Johansson's services.  Daly wrote (Def. Ex. 27):

> I do not believe this arrangement was strange or suspect . . . . I for one did not question at all when Claus' name . . . was included in their business plan.  I believe Claus would have been an important component in their strategy for a short period of time.  If the [purchaser] was going to do something "suspect" with Claus why would they telegraph it to us in their written [business plan].

42.     Plaintiff called Forness and admitted that she had lost her temper with Johansson (Pl. dep. at 110-11; Forness Decl. ¶ 12) and feared she would be fired for her e-mail.  (Forness dep. at 206-08.)

43.     Forness reassured Plaintiff that "we don't fire people for raising a concern." (Forness dep. at 208; *see also* Def. Ex. 14 at IMAGINE003384.)

44.     During the same phone call referenced in Paragraph 40, Plaintiff told Forness that

THE DOCUMENT IS FILED UNDER SEAL AND IS SUBJECT TO A
COURT ORDER REGARDING CONFIDENTIAL INFORMATION
(REDACTED VERSION)

she was suffering from work-related stress.  (Pl. dep. at 110-11, 185-86; Forness Decl. ¶ 12.)

45.     Sekse met with Plaintiff in New York on June 5 (Sekse Ex. 3) to discuss appropriate ways to interact with colleagues. (Pl. dep. at 178-79; Sekse Decl. ¶10.)

46.     Plaintiff viewed this meeting as a sign that she was "in trouble" and became "afraid" because she did not normally deal with Sekse directly.  (Pl. dep. at 179.)  Because she was "frightened," Plaintiff shared with Sekse that she had "planned some medical appointments."  (*Id.*)

47.     During that meeting Sekse merely tried to counsel Plaintiff on handling interpersonal conflicts by "shar[ing]" "some examples of dealing with frustrating situations that he had had while working."  (Pl. dep. at 178-79; Sekse Decl. ¶ 10.)

48.     On June 6, Johansson sent an e-mail responding to Plaintiff's accusations, stating that he had "absolutely no reason to discuss" his proposed role with the purchaser with Plaintiff "since it was written all over the place and I have discussed it with [Daly]."  (Def. Ex. 28.)

49.     After Johansson's June 6 e-mail to Plaintiff, Daly – who expressed concern that these e-mails were distracting the team from its work (Forness Decl. ¶ 13) – called for a halt to e-mails on the subject and encouraged everyone to "focus on getting the deal done and all rowing in the same direction" (Def. Ex. 28).

50.     Although Plaintiff interprets Daly's e-mail as critical of her, she has no personal knowledge of Daly's intent in writing it.  (Pl. dep. at 180-81; Def. Ex. 28.)

51.     Though Plaintiff claims she believed "management was trying to get rid of [her] following [her] e-mail of June 2nd" (Pl. dep. at 199-200), Defendants never indicated that she "should not have brought to their attention Mr. Johansson's potential conflict." (Pl. dep. at 204-05; Forness Decl. ¶ 14)

52.     No action was taken against Plaintiff as a result of her accusatory e-mail to Johansson.  (Forness dep. at 208; Forness Decl. ¶15.)

THE DOCUMENT IS FILED UNDER SEAL AND IS SUBJECT TO A
COURT ORDER REGARDING CONFIDENTIAL INFORMATION
(REDACTED VERSION)

53.     Plaintiff was not fired for her actions.  (Pl. dep. at 242, 246-47)

54.     Nor was Plaintiff demoted from her position of Senior Underwriter for her actions.
(Sekse Decl. ¶ 11; Forness Decl. ¶ 15.)

55.     Nor were Plaintiff's salary or benefits decreased at any time.  (Sekse Decl. ¶ 11;
Forness Decl. ¶ 15.)

56.     Plaintiff was not removed from working on the sale of IIAS – which closed on June
22, 2006 – and continued to work on the project even after the closing.  (Pl. dep. at 224-25, 233.)

57.     From June 2, 2006 to September 12, 2006 Plaintiff worked on projects including (1)
the BQC project, which she described as "a pretty significant undertaking" (Pl. dep. at 227), (2)
the RCA audit, (3) the Lloyd's syndicate problem, which she characterized as a project of "high
importance and priority to management," (4) the Falls declaratory judgment action, (5) post-
closing matters on IIAS and (6) the "HRMP renewal."  (Pl. dep. at 233-34.)

58.     Daly "indicated to [Plaintiff] that he would not have chosen [her] route" of sending
an accusatory e-mail with copies to the whole team.  (Pl. dep. at 204.)

59.     Plaintiff remained fully occupied with work in July and August 2006 (Pl. dep. at
233-34), and "worked remotely" while on vacation from August 14 - 25.  (Am. Compl. ¶ 110.)

60.     Plaintiff was never instructed to stop performing her main duty – production of
business – following her June 2nd e-mail.  (Pl. dep. at 269.)

61.     On June 13, Plaintiff had an appointment with Dr. Nedra Rosen, an internist, to
address her stress level, "smoking habit" and "alcohol habit."  (Pl. dep. at 17, 23.)

62.     Plaintiff saw Dr. Rosen three times in the period from June through August 2006,
and at each visit Dr. Rosen made a record of what Plaintiff told her.  (Rosen dep. at 10-12, 15;
Rosen Ex. 3.)

63.     On June 13, Plaintiff told Dr. Rosen she was " ██████████████████████

THE DOCUMENT IS FILED UNDER SEAL AND IS SUBJECT TO A
COURT ORDER REGARDING CONFIDENTIAL INFORMATION
(REDACTED VERSION)

████████████████" but "████████████████████████████

███████████████" (Rosen dep. at 23; Rosen Ex. 3.)  Dr. Rosen wrote: "'█████████

████████████████████████████████████████████████████████

████████" (Rosen dep. at 25-26; Rosen Ex. 3.)

64.     At Plaintiff's second visit on June 28, Dr. Rosen again advised Plaintiff to see a

psychiatrist, writing that Plaintiff declined to do so ("███████████████████").  (Rosen dep. at

41-42.)

65.     At Plaintiff's final visit to Dr. Rosen on August 30, the physician noted that

"patient appears depressed and I have urged her to see [a] psychiatrist as it seems that she needs

professional counseling and antidepressant medication."  (*Id.* at 46; Rosen Ex. 3.)  Plaintiff did not

take this advice and never returned to see Dr. Rosen. (Pl. dep. at 25-27; Rosen dep. at 51.)

66.     Medical records written by Dr. Dennis Brown, a psychiatrist Plaintiff saw three

times in 1999 while employed by Swiss Re (a company Plaintiff accused of sex discrimination),

also detail Plaintiff's treatment for work-related stress (Def. Ex. 48).  Dr. Brown wrote that

Plaintiff "███████████████████" suffered from "███████████████████" felt

"███████████████████████████" and exhibited depression.  (Civita

Decl. at ¶ 5 & Ex. C.)

67.     On August 9, 2008, a few days before her scheduled vacation, Plaintiff told Forness

she was suffering from depression and work-related stress.  (Forness Decl. ¶16.)

68.     Forness took notes of the conversation, in which Plaintiff told him that the IIAS

sale "debacle" had "created anxiety, led to a breakdown emotionally" and that she was "seeking

professional help for severe depression."  (Forness Decl. ¶ 16 & Ex. A.)

69.     Forness told Plaintiff he was concerned about her well-being and that they could

discuss reducing her workload if she wished after she returned from her upcoming vacation.

THE DOCUMENT IS FILED UNDER SEAL AND IS SUBJECT TO A
COURT ORDER REGARDING CONFIDENTIAL INFORMATION
(REDACTED VERSION)

(Forness dep. at 226-27; Forness Decl. ¶ 16 & Ex. A.)

70.     Plaintiff took no notes of her August 9 conversation with Forness.  (Pl. dep. at 210.)

71.     Plaintiff went on vacation and returned to the office on August 26 (Pl. dep. at 201), but neither Plaintiff nor Forness raised the subject of Plaintiff's workload.  (*Id.*; Forness Decl. ¶ 16; Am. Compl. ¶ 114.)

72.     On August 29, Forness told Sekse that Plaintiff had revealed to him that she was suffering from work-related stress and depression and was under medical care.  (Sekse dep. at 88; Sekse Decl. ¶ 12; Forness dep. at 225.)  Sekse told Forness he should not discuss medical issues with Plaintiff and, instead, should refer her to Human Resources.  (Sekse dep. at 69-70; Forness dep. at 236.)

73.     Plaintiff considered herself to be suffering from depression at the time of Forness' conversation with Sekse.  (*See* Rosen Ex. 3; Def. Ex. 17 ("I am indeed depressed . . .").)

74.     On August 31, Sekse telephoned Plaintiff to follow up on what he had learned from Forness.  Plaintiff told Sekse that she recently had seen her physician "and that in fact [she] was feeling depressed."  (Pl. dep. at 189; Sekse Decl. ¶ 12.)  She informed Sekse that she had received "a referral from a doctor for additional medical assistance . . . to speak with about any depression issues I wanted to discuss."  (Pl. dep. at 198-200)

75.     Also during their August 31 conversation, Plaintiff told Sekse she had been turned down for disability insurance.  (Pl. dep. at 187-88; Sekse Decl. ¶ 12.)  Sekse asked Plaintiff to send him the written notice from the insurance carrier so he could help straighten out her coverage. (Sekse Decl. ¶ 12), and plaintiff responded by telling Sekse that she was "happy to pdf the letter to [him] tomorrow."  (Def. Ex. 44.)  Following receipt of the letter, Sekse resolved Plaintiff's coverage issue.  (Sekse dep. at 94-95, 97; Sekse Decl. ¶12.)

76.     After Plaintiff told Sekse about her depression and medical referral, Sekse

THE DOCUMENT IS FILED UNDER SEAL AND IS SUBJECT TO A
COURT ORDER REGARDING CONFIDENTIAL INFORMATION
(REDACTED VERSION)

suggested that Plaintiff take advantage of the slow Labor Day period by taking a week off, with

full pay, to take care of herself.  (Sekse dep. at 98.)  He followed up with an e-mail saying:

> Please take tomorrow and next week off to consider the medical advice you have
> received and the referral you have been given.  I am not concerned whether this is
> sick leave or short term disability at this point.  Above all, I want to make sure
> you take advantage of the benefit programs available to you and that we are not
> aggravating your condition through pressure at work.  (Def. Ex. 4.)

77.     Plaintiff did not object to or argue with Sekse's offer; rather, she took the time off

without complaint.  (Pl. dep. at 198-200; Sekse Decl. ¶ 13.)

78.     Plaintiff received her fully salary during her absence beginning on September 1,

2006.  (Pl. dep. at 247.)

79.     Sekse did not involve Plaintiff's supervisor Forness in his decision to offer Plaintiff

time off.  (Sekse Decl. ¶ 13; Forness Decl. ¶ 18.)

80.     On September 8, 2006, Plaintiff's lawyer, Stacey M. Gray, sent a letter by e-mail to

Sekse (who was then in Europe(Sekse Decl. ¶ 14)) alleging gender and disability discrimination,

and Sarbanes-Oxley whistleblower retaliation.  (Sekse Ex. 4.)  Specifically, Gray alleged that

"adverse employment decisions" had been made against Plaintiff "in clear violation" of Sarbanes-

Oxley, including "decreasing her duties as a 'Senior Underwriter', and essentially replacing her

with a consultant."  (*Id.*)  Gray also asserted that as a result of Plaintiff "engag[ing] in protected

activity under" Sarbanes-Oxley, Defendants had portrayed Plaintiff "as the modern-day damsel in

distress as a pretext to demote, disable and possibly terminate her" and as "mentally impaired."

(*Id.*)

81.     IAI and IGHL have a policy against unlawful discrimination or harassment.  (Def.

Ex. 14 at IMAGINE003380.)

82.     None of the Defendants had ever been charged previously with discrimination or

retaliation.  (Sekse Decl. ¶ 15.)

THE DOCUMENT IS FILED UNDER SEAL AND IS SUBJECT TO A
COURT ORDER REGARDING CONFIDENTIAL INFORMATION
(REDACTED VERSION)

83.     On September 11, 2006, Sekse telephoned Plaintiff from Europe (Pl. dep. at 243-44;
Sekse Decl. ¶ 17), told her that he needed to get legal advice to respond to her lawyer's letter and
asked her to take the rest of the day off while he did so.  (Sekse dep. at 48-49; Sekse Decl. ¶ 17.)

84.     Defendants immediately retained counsel, who contacted Gray that same day and
asked if Plaintiff wished to return to work.  (Def. Ex. 8; Sekse Decl. ¶ 17.)

85.     Gray responded at 7:34 a.m. the next morning, alleging that Plaintiff had been
placed involuntarily on leave "without providing any notice as to when she would be able, if ever,
to return." (Def. Ex. 8.)  Defendants' counsel responded minutes later, at 7:59 a.m., telling Gray
that Plaintiff "can return any time she wishes. Plaintiff was offered, and accepted, time off until
Mr. Sekse could seek counsel as to how to handle her requests." (*Id.*)

86.     After being invited to return to work before the business day began on September
12, 2006, Plaintiff chose not to return for weeks and testified that Gray gave her that option: "I
was advised by my counsel that I could return to work or remain at home . . . ." (Pl. dep. at 250.)

87.     IAI and IGHL have a Code of Business Conduct & Ethics, which contains a
procedure for employees to make complaints of any type. (Def. Ex. 14 at IMAGINE003384; Def.
Ex. 1 at 0400.)

88.     Plaintiff never went to Human Resources to complain about discrimination of any
type until her lawyer sent the above-mentioned letter via e-mail to Sekse on September 8, 2006.
That letter constituted the first time Plaintiff complained about alleged discrimination on the basis
of gender or perceived disability.  (Sekse Decl. ¶ 16.)

89.     Plaintiff made no mention of a whistleblower policy or a whistleblower complaint
before her lawyer's letter of September 8, nor did she ever call the Ethics Hotline to report a
violation.  (Def. Ex. 12; Pl. dep. at 309.)

90.     Defendants asked Plaintiff to produce any reports she made under the policy

THE DOCUMENT IS FILED UNDER SEAL AND IS SUBJECT TO A
COURT ORDER REGARDING CONFIDENTIAL INFORMATION
(REDACTED VERSION)

(which could be done anonymously) as well as any related evidence so that they could investigate and respond.  Plaintiff provided nothing.  (Def. Ex. 38.)

91.     From August 31 to October 2, Plaintiff was in the office only once – on September 11, 2006. (*see* Pl. dep. at 243-44, 253.)

92.     On September 29, 2006, after Plaintiff had been absent from work with full pay (Pl. dep. at 290) for some three weeks, Defendants' counsel wrote to Gray that Plaintiff "must return to work on Monday" October 2.  (Def. Ex. 9.)

93.     Plaintiff returned to work that day and gave Sekse notice that she would leave at the end of her contract term, asserting unilaterally that she had "Good Reason" to resign.  (Def. Ex. 18; Sekse Decl. ¶ 18.)

94.     At a meeting the very next day, Plaintiff asked Forness and Sekse to clarify her duties.  (Def. Ex. 5.)

95.     On October 6, 2006, Sekse sent Plaintiff an e-mail "outlining [Plaintiff's] main responsibilities" and offering to discuss any "particular additional responsibilities that [Plaintiff] would like to take on."  (*Id.*)

96.     Once Plaintiff made it known that she intended to leave the company, she was treated identically to – and no less favorably than – all other IAI employees who had ever delivered notice of intent to leave the company.  (Forness Decl. ¶ 25; Sekse Decl. ¶22.)

97.     Section 1 of the Employee Handbook has contractual effect and imposes obligations on the employee.  (Def. Ex. 1 at 0384.)

98.     Upon receipt of Plaintiff's resignation notice on October 2, Defendants followed their standard practice to (a) transfer key responsibilities and all client contact from the departing employee to remaining employees, (b) assess whether there were tasks the departing employee could perform without jeopardizing client relationships or using confidential and proprietary

THE DOCUMENT IS FILED UNDER SEAL AND IS SUBJECT TO A
COURT ORDER REGARDING CONFIDENTIAL INFORMATION
(REDACTED VERSION)

information, and (3) wind up the departing employee's work as soon as possible.  (Sekse dep. at

202; Sekse Decl. ¶ 20.)  This procedure is set forth in Section 1 of the Employee Handbook (Def.

Ex. 1, § 15.6):

> During all or part of your notice period . . . the Company reserves the right to
> require you to perform work which does not normally form part of your duties, to
> undertake special projects, not to perform any of the duties under the Contract, not
> to have any contact with clients of the Company, not to have any contact with such
> employees as the Company shall determine . . . not to enter any Company premises
> and/or require you not to visit the premises of the Company's customers, to work
> from home or not to attend work at all.

99.     The Employee Handbook explicitly states that Sections II, III and IV "do not have

contractual effect between you and the Company."  (Def. Ex. 1, at 0378 (emphasis in original).)

100.     In or about spring 2006, IAI began to plan a new project called Business Quality

Control (referred to either as "BQC," "BA" or "Business Assurance") to establish standards for

auditing and oversight of transactions.  (Forness Decl. ¶ 21 & Ex. B; Koegel Aff. ¶ 5.)

101.     The BQC team initially consisted of Plaintiff and Koegel. (Def. Ex. 40; Forness

Decl. ¶ 21; Koegel Aff. ¶ 5.)

102.     As it became clear that the project entailed more work than they could handle – a

conclusion with which Koegel agreed (Koegel Aff. ¶ 5; Forness Decl. ¶ 22) – IAI identified

independent contractors with claims auditing experience to assist as needed.  (Koegel dep. at 301;

Forness Decl. at 22)  Ultimately, IAI retained nine independent contractors to assist with the BQC

project.  (Koegel dep. at 315-17: Forness Decl. at 22.)

103.     Independent contractor Vanette Fleming was never hired by IAI or IGHL, and she

performed no audit until mid-October (Koegel dep. at 300-01), weeks after Plaintiff delivered her

notice of resignation.  (Forness Decl. ¶ 22 & Ex. C; Koegel Aff. ¶ 5.)

104.     Plaintiff continued performing tasks on the BQC project into December 2006, long

after she delivered her notice of resignation (Def. Ex. 42).

THE DOCUMENT IS FILED UNDER SEAL AND IS SUBJECT TO A
COURT ORDER REGARDING CONFIDENTIAL INFORMATION
(REDACTED VERSION)

105.   If Plaintiff had not decided to give notice of resignation, she would have continued working alongside Koegel on BQC, handling BQC audits, overseeing the "Falls" declaratory judgment action and taking on new assignments as they arose.  (Forness Decl. ¶ 20.)

106.   Plaintiff took from Defendants – in violation of company policy (Def. Ex. 1 at 0393) – confidential and proprietary business documents.  (Pl. dep. at 125-44.)  Among the documents removed and retained were attorney-client privileged memoranda containing advice on legal matters that had been discussed with Plaintiff during her employment.  (Pl. dep. at 124-28.)

107.   In consultation with Gray, Plaintiff disclosed the attorney-client privileged memoranda she removed and retained publicly in her EEOC Charge and in her Amended Complaint.  (Pl. dep. at 141-42; Am. Compl. ¶ 82.)

108.   On December 19, 2006, Defendants informed Plaintiff – pursuant to § 15.6 of the Employee Handbook – that she was no longer needed at the office and would work from home on any matters assigned to her.  (Pl. dep. at 246-47; Sekse dep. at 45, 109.)

109.   Defendants awarded Plaintiff a discretionary bonus for her work in 2006.  (Sekse Ex. 19; Sekse Decl. ¶ 22.)

110.   Following their practice for employees who have given notice, Defendants did not consider Plaintiff for a discretionary LTIP award because such awards are intended as incentives for future performance and commitment by eligible employees.  (Def. Ex. 33; IGHL dep. at 66; Sekse Decl. ¶ 22.)  If Plaintiff had not decided to give notice of resignation, she would have continued to be eligible for discretionary LTIP awards.  (Forness Decl. ¶ 19.)

111.   Defendants also did not consider Plaintiff for a salary increase after she gave notice because such increases are intended as incentives for future performance and commitment by eligible employees.  (Forness dep. at 199-200.)  If Plaintiff had not decided to give notice of resignation, she would have continued to be eligible for discretionary salary increases.  (Forness

THE DOCUMENT IS FILED UNDER SEAL AND IS SUBJECT TO A
COURT ORDER REGARDING CONFIDENTIAL INFORMATION
(REDACTED VERSION)

Decl. ¶ 19.)

112.   The corporate defendants did not consider increasing the salary of or granting an LTIP award to any employee who had given notice.  (Sekse Decl. ¶ 22).

113.   Plaintiff's expert witness Frank Tinari testified:  "[A]s an employer myself, if someone were to leave, there would be no incentive for me to increase pay in the remaining time of the employee's stay with my company." (Tinari dep. at 104-05.)

114.   Plaintiff received full salary and employee benefits until the end of her contract. (Sekse Decl. ¶ 24.)  Thereafter, she worked as an independent contractor for a company called CRA. (Pl. dep. at 28-29.)

115.    Plaintiff requested and received from Defendants a waiver of a restriction in her employment agreement so she could work for CRA. (Pl. dep. at 94-95; Sekse Decl. ¶23 & Ex. A.)

116.   Plaintiff did not contact headhunters to seek new employment because she had had a "conflict" with one in the past.  (Pl. dep. at 101.)

117.   Plaintiff did not pursue full-time employment with CRA – though CRA had wanted to hire her in the past – "because [she didn't] find transfer pricing very interesting."  (*Id.* at 33-34.)

118.   Plaintiff did not make any attempt to find a new job until after her IAI salary ended. (*Id.* at 103-04.)

Dated:  New York, New York
      December 12, 2008

                       HOGAN & HARTSON LLP

                       By:               **/s/**
                           Barbara M. Roth (BMR 1982)
                           Nicole Civita (NC 0727)
                           875 Third Avenue
                           New York, NY 10022
                           Tel:  (212) 918-3000
                           Fax:  (212) 918-3100
                           *Attorneys for Defendants*